# DALE J. HOGAN ET AL. *v.* TERESA B. LAGOSZ
## (AC 30545)

Bishop, Gruendel and Harper, Js.

Argued May 20—officially released October 26, 2010

*Jonathan M. Starble,* with whom, on the brief, was *Marybeth C. McPadden,* for the appellant (named defendant).

*Kevin M. O'Brien,* with whom was *Neil E. Atlas,* for the appellees (plaintiffs).

*Opinion*

GRUENDEL, J. In this easement dispute between neighbors, the defendant Teresa B. Lagosz appeals from the judgment of the trial court[1] granting the motion to

[1] We note that the trial court file in this case contains no judgment file. "Before reaching the merits of the [defendant's] claims, we must first determine whether a final judgment exists and, therefore, whether this court has subject matter jurisdiction over this appeal. The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal." (Internal quotation marks omitted.) *Vance* v. *Tassmer,* 115 Conn. App. 696, 699–700, 975 A.2d 85 (2009). "An otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." *State* v. *Curcio,* 191 Conn. 27, 31, 463 A.2d 566 (1983). We conclude that we have jurisdiction to hear the defendant's appeal because the trial court's action granting the motion to enforce the settlement agreement here satisfied the second prong of *Curcio* in that it "so conclude[d] the rights of the parties that further proceedings [could not] affect them." Id. Although the trial court retained jurisdiction "over this matter until the parties have filed, no later than forty-five days from the date hereof, such stipulations and documentation as the court deems necessary to give full force and

enforce a settlement agreement filed by the plaintiffs, Dale J. Hogan and Maria J. Hogan.[2] The defendant claims that the court improperly concluded that (1) her attorney possessed apparent authority to act on her behalf and (2) the parties entered into a binding settlement agreement. In support of the latter contention, the defendant further asserts that the court improperly found the settlement agreement enforceable in the face of a mutual mistake. We affirm the judgment of the trial court.

On May 26, 2005, the sellers by warranty deed conveyed to the plaintiffs two vacant lots located in Berlin. Known as "Lot 27 Norton Lane" and "Lot 28A Norton Lane," they sat to the rear of 468 Norton Lane (parcel), which, at all relevant times, was owned by the defendant. It is undisputed that the lots are landlocked.

In dispute was whether the parcel was subject to an easement bridging the lots to Norton Lane. On February 24, 2006, the plaintiffs commenced an action against the defendant, alleging that the parcel was subject to a right-of-way described on the Berlin land records as "20' Access Easement in favor of Lot 28A." They further alleged that, in maintaining a locked gate across the right-of-way, the defendant obstructed their use thereof. In response, the defendant filed an answer and two special defenses, in which she averred that the alleged right-of-way had been lost by abandonment or adverse possession. Because the warranty deed provided that the sellers conveyed "all rights of way to the [r]oadway,

effect to the agreement," the actions that remained to be taken were purely ministerial in nature. Cf. *Vance* v. *Tassmer*, supra, 702 (granting of motion to enforce settlement agreement not final judgment for purposes of appeal where enforceability of agreement contingent on granting of variance by zoning board of appeals).

[2] The plaintiffs' amended complaint also named as defendants Jacqueline Root, Cass Witkowski, Eleanor Dyer and Rose Davis, who were cited in after the case commenced. For clarity, we refer in this opinion to those defendants as the sellers and to Teresa Lagosz as the defendant.

known as Norton Lane," the plaintiffs thereafter cited in the sellers as additional defendants to recover damages for breach of warranty under that deed.

The parties appeared for trial on the morning of March 5, 2008, at which time a settlement discussion ensued among their attorneys. The parties reached an agreement in principle and thus requested a thirty day continuance to "finalize the documentation" that was to be incorporated into the stipulated judgment, which the court, *Hon. Julius J. Kremski*, judge trial referee, granted. The parties and their attorneys remained in the courtroom after Judge Kremski departed, and the settlement discussion continued. As that discussion transpired, surveyor John L. Guilmartin, Jr., who had been scheduled to testify at the proceeding, arrived. The parties and their attorneys met with Guilmartin to discuss placement of an easement over the parcel as shown on an existing survey prepared in November, 2007, for the state by Eric Seitz Land Surveying, Inc. (existing survey). They instructed Guilmartin to modify the right-of-way depicted on that survey so as to traverse the southern portion of the parcel and to remain approximately one foot from that property line. As the defendant stood beside him, the defendant's husband, Joseph Lagosz, drew a line on the survey with his finger as to the location of the new right-of-way.[3]

While Joseph Lagosz detailed the location of the right-of-way, counsel for the defendant, attorney Jack M. Bassett, drafted a handwritten document titled "Essential Terms of Agreement" (agreement). It provides: "1.

---

[3] Although Joseph Lagosz is not a party to this action, the record reflects his significant involvement therein. In its memorandum of decision, the court found that "Joseph Lagosz was [the defendant's attorney Jack M. Bassett's] primary contact at meetings throughout the course of the litigation, including the times when the defendant was present," a finding that the defendant does not contest on appeal. We refer to Joseph Lagosz by name in this opinion.

[The defendant] will agree to granting a [twenty foot] wide [right-of-way] from the gate positioned at [the railroad] tracks/Norton Lane to the [plaintiffs'] premises, Lot 28A, subject to placement by agreement (ingress and egress). 2. The parties will cooperate in defining the placement of the [right-of-way] by the plaintiffs' surveyor as closely as possible in keeping with the outline sketch placed upon a copy of the [existing survey] in court today. 3. The parties will maintain insurance coverage pertaining to their respective insurable interests on the subject [right-of-way] area. 4. [The sellers] agree to pay the sum of $5000 to [the defendant's] counsel as trustee within ninety days of the date hereof. 5. The parties will not unreasonably park cars upon or otherwise impede the [right-of-way]. 6. [The] plaintiffs, at their sole expense, will pay for the preparation and filing of the map or plan depicting the newly defined [right-of-way] area. 7. The parties will share reasonable costs in the portion of the [right-of-way] mutually utilized, with the plaintiffs bearing sole responsibility for the maintenance in the travel portion pertaining to their remaining area. 8. The parties agree to keep the gate at Norton Lane in place, locked with a combination lock with the combination to be shared. The parties will only share the combination reasonably in a limited fashion with appropriate business and personal invitees and licensees of the parties. In the event that unintended access abuses are observed, either party can change the combination with required immediate provision of the new number to the other." The respective attorneys for the plaintiffs, the defendant and the sellers signed the agreement at that time.

In the following weeks, counsel for the plaintiffs drafted a stipulated judgment and an easement for the defendant's review. In addition, Guilmartin prepared a survey, consistent with the instructions provided to him on March 5, 2008, that featured the new right-of-way

across the parcel.[4] Those documents were forwarded to Bassett. On April 17, 2008, Bassett scheduled a meeting at his office with Joseph Lagosz to review those materials, at which time Joseph Lagosz informed him of the termination of his services by the defendant. Six days later, attorney Jonathan M. Starble filed an appearance on behalf of the defendant in lieu of Bassett.

On April 24, 2008, the plaintiffs filed a motion to enforce the agreement. The court held an evidentiary hearing on the matter on May 22, 2008. Guilmartin, Bassett and Dale J. Hogan testified in support of the motion, while the defendant testified in opposition. In addition, documentary evidence was submitted and the parties filed posthearing briefs.[5] In its November 7, 2008 memorandum of decision, the court expressly credited the testimony of Bassett and Guilmartin, stating that "[a]t all times, the court found the witnesses . . . Bassett and Guilmartin to be competent and their testimony to be believable and credible." The court rejected the defendant's contention that Bassett lacked authority to sign the agreement on her behalf. Finding the language of the agreement clear and unambiguous, the court further found it to be "a binding settlement agreement." In addition, the court found that "the parties manifested their agreement as to the location of the right-of-way and directed the surveyor to depict its location on the survey, which he prepared in accordance with their instructions." At the same time, the court noted that "[t]o the extent that the survey prepared by Guilmartin or the terms of the ancillary legal documents *directly*

---

[4] The question of whether Guilmartin's survey conflicts with the terms of the agreement is not before us. In articulating its decision on July 27, 2009, the court stated that it "did not consider any ancillary documents created after March 5, 2008," in determining the terms of the parties' settlement agreement.

[5] The plaintiffs and the sellers each submitted posthearing briefs in support of the motion to enforce the settlement agreement; the defendant filed one in opposition.

conflict with the terms of the agreement as found by this court, any such terms are not permitted, absent agreement of the parties." (Emphasis in original.) The court thus retained jurisdiction "over this matter until the parties have filed, no later than forty-five days from the date hereof, such stipulations and documentation as the court deems necessary to give full force and effect to the agreement."[6] This appeal followed.

I

The defendant challenges as clearly erroneous the court's finding that Bassett possessed apparent authority to sign the agreement on her behalf. She argues that "there simply was no evidence upon which the court could have concluded that . . . Bassett had apparent authority to bind [the defendant] to a settlement agreement." We disagree.

It is well established that "[a]n agent's authority may be actual or apparent." *Gordon* v. *Tobias*, 262 Conn. 844, 849, 817 A.2d 683 (2003). "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action."

---

[6] In this appeal, we consider only the propriety of the granting of the plaintiffs' motion to enforce the agreement.

(Internal quotation marks omitted.) Id., 850–51; see also *Nowak* v. *Capitol Motors, Inc.*, 158 Conn. 65, 69, 255 A.2d 845 (1969); *Quint* v. *O'Connell*, 89 Conn. 353, 357, 94 A. 288 (1915); 1 Restatement (Third), Agency § 2.03, p. 113 (2006). Resolution of the factual issue of apparent authority requires "the trier of fact to evaluate the conduct of the parties in light of all of the surrounding circumstances." *Lettieri* v. *American Savings Bank*, 182 Conn. 1, 9, 437 A.2d 822 (1980); see also *Union Trust Co.* v. *McKeon*, 76 Conn. 508, 514, 57 A. 109 (1904) ("the existence of an apparent agency is essentially a question of fact, to be determined by the trier from all the legitimate and relevant evidence in the case bearing upon that question").

In the present case, the court found that Bassett had apparent authority to sign the agreement on the defendant's behalf. We review that finding under the clearly erroneous standard. See *Gordon* v. *Tobias*, supra, 262 Conn. 849. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

In analyzing a similar claim, we recently observed that "this is not a case in which the court found apparent authority simply as a result of retaining a lawyer and having him negotiate on behalf of a client." *Yale University* v. *Out of the Box, LLC*, 118 Conn. App. 800, 810, 990 A.2d 869 (2010). Likewise, the evidence of the defendant's conduct at the March 5, 2008 proceeding, viewed in light of the surrounding circumstances, substantiates the finding of the court that Bassett possessed apparent authority to sign the agreement on the defendant's

behalf. Bassett testified that the defendant and Joseph Lagosz were present throughout the settlement discussions that transpired at the courthouse on that date. He further testified that, at that time, he sequestered himself with the defendant and Joseph Lagosz to discuss the case. Significantly, Bassett testified that he reviewed every aspect of the agreement with the defendant prior to signing it on her behalf. Bassett explained that he inserted a provision in the agreement pertaining to the placement of a combination lock on the gate at Norton Lane at the behest of the defendant. The court expressly credited Bassett's testimony.

In addition, the court heard testimony from Bassett, Guilmartin and Dale J. Hogan concerning the involvement of the defendant and Joseph Lagosz in determining the precise location of the new right-of-way on the existing survey. Guilmartin testified that, in the courtroom on March 5, 2008, he was instructed by the attorneys and Joseph Lagosz, in the presence of the defendant, as to the contours of the new right-of-way. Dale J. Hogan provided the court with even more specificity, explaining how he stood at a table in the courtroom with the defendant, Joseph Lagosz and Guilmartin as Joseph Lagosz shared "his idea" regarding "the settlement" by indicating on the existing survey where the right-of-way should be placed. At that point, Joseph Lagosz drew a line on the survey with his finger as to the desired location. Dale J. Hogan testified that the defendant was standing next to Joseph Lagosz at that time and indicated her agreement by "nodding up and down." Such conduct on the part of the defendant reasonably could lead the plaintiffs in good faith to believe that, when Bassett signed the agreement on her behalf minutes later, he had authority to do so.

Moreover, the defendant testified at the evidentiary hearing that the purpose of the March 5, 2008 meeting in the courthouse was "to finalize this, to get the

agreement . . . ." She acknowledged that Bassett at that time represented her as her advocate. Although not dispositive; see *Acheson* v. *White*, 195 Conn. 211, 213 n.4, 487 A.2d 197 (1985) ("[a]n attorney who is authorized to represent a client in litigation does not automatically have either implied or apparent authority to settle or otherwise to compromise the client's cause of action"); the fact that Bassett on March 5, 2008, acted as the defendant's attorney is not insignificant. Central to the question of apparent authority is whether the defendant held Bassett out as possessing sufficient authority to embrace the act in question, in this case, settlement of the easement dispute, as well as whether the plaintiffs in good faith believed that Bassett had the necessary authority to bind the defendant to his action. The record is bereft of evidence that the defendant voiced any objection as to the settlement discussions, the new right-of-way delineated by Joseph Lagosz or the agreement executed on March 5, 2008. Particularly noteworthy is the fact that when court opened on that date, the attorneys, in the presence of the defendant and the other parties, informed the court that a settlement had been reached.

On the witness stand, the defendant nevertheless testified that she had no recollection of what the attorneys told the court on March 5, 2008. The defendant further contradicted the testimony of Bassett, Guilmartin and Dale J. Hogan that she and Joseph Lagosz reviewed the existing survey in the courtroom with Guilmartin, testifying that she was not "involved . . . in any kind of agreement as to where there would be a location of an easement." When asked whether Joseph Lagosz at that time drew a line on the survey with his finger as to the desired location of the right-of-way, the defendant testified both that "[i]f he did, I don't remember," and that "[i]f he did, I must have turned away and I didn't

see it." As trier of fact and, hence, sole arbiter of credibility, the court was "free to accept or reject, in whole or in part," the defendant's testimony. (Internal quotation marks omitted.) *DiVito* v. *DiVito*, 77 Conn. App. 124, 138, 822 A.2d 294, cert. denied, 264 Conn. 921, 828 A.2d 617 (2003). The court did not credit the defendant's testimony in its memorandum of decision, as it did the testimony of other witnesses. Rather, the court found her testimony to be "self-serving," as is the court's exclusive prerogative. See, e.g., *Mann* v. *Regan*, 108 Conn. App. 566, 581, 948 A.2d 1075 (2008) (trier of fact "free to disbelieve the defendant and to reject this testimony as self-serving").

As our Supreme Court has noted, "[t]he aim of the courts in formulating and developing rules as to apparent authority has been to protect, under proper circumstances, a third person in his dealings with an agent who lacks express authority." *Keeler* v. *General Products, Inc.*, 137 Conn. 247, 251, 75 A.2d 486 (1950). The question before the trier in the present case was whether the defendant by her conduct, interpreted in light of the surrounding circumstances, caused the belief on the part of the plaintiffs that Bassett had the requisite authority to sign the agreement on her behalf. See *Hollywyle Assn., Inc.* v. *Hollister*, 164 Conn. 389, 396, 324 A.2d 247 (1973). The court answered that query in the affirmative. On our review of the evidence adduced at the May 22, 2008 hearing, we conclude that the court's finding was not clearly erroneous.

II

The defendant also maintains that the court improperly granted the plaintiffs' motion to enforce the agreement. Arguing that the agreement lacked a clear and definitive description of the location of the new right-of-way, the defendant claims that the court

improperly concluded that it was summarily enforceable. We reject that contention.

"A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811, 626 A.2d 729 (1993). Because the defendant challenges the trial court's legal conclusion that the agreement was summarily enforceable, we must determine "whether that conclusion is legally and logically correct and whether [it finds] support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *Thomsen* v. *Aqua Massage International, Inc.*, 51 Conn. App. 201, 204, 721 A.2d 137 (1998), cert. denied, 248 Conn. 902, 732 A.2d 178 (1999). In addition, to the extent that the defendant's claim implicates the court's factual findings, "our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Aquarion Water Co. of Connecticut* v. *Beck Law Products & Forms, LLC*, 98 Conn. App. 234, 238, 907 A.2d 1274 (2006).

The dispute giving rise to the present litigation concerned the existence of an easement over the parcel. The agreement contains eight detailed provisions regarding the resolution of that dispute. It provides, inter alia, that "[the defendant] will agree to granting a [twenty foot] wide [right-of-way] from the gate positioned at [the railroad] tracks/Norton Lane to the [plaintiffs'] premises, Lot 28A, subject to placement by

agreement (ingress and egress)." The agreement also incorporated by reference Joseph Lagosz' in-court sketch of the location of the new right-of-way, providing that "[t]he parties will cooperate in defining the placement of the [right-of-way] by the plaintiffs' surveyor as closely as possible in keeping with *the outline sketch placed upon a copy of the [existing survey] in court today*"[7] and further that "[the] plaintiffs, at their sole expense, will pay for the preparation and filing of the map or plan depicting *the newly defined [right-of-way] area.*" (Emphasis added.)

In granting the motion to enforce the agreement, the court concluded that the agreement was clear and unambiguous as to the location of the new right-of-way. We agree. The first essential term of the agreement expressly indicated that the right-of-way commences at "the gate positioned at [the railroad] tracks/Norton Lane," which is described as the "metal gate" on the eastern side of the existing survey and through which the defendant's "existing driveway" passes. Similarly, the seventh essential term indicates that a portion of the new right-of-way will be "mutually utilized . . . ." That provision states that "[t]he parties will share reasonable costs in the portion of the [right-of-way] mutually utilized, with the plaintiffs bearing sole responsibility for the maintenance in the travel portion

---

[7] In interpreting the agreement, we must afford the language employed "its common, natural, and ordinary meaning . . . ." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 110, 900 A.2d 1242 (2006); *Rumbin* v. *Utica Mutual Ins. Co.*, 254 Conn. 259, 286, 757 A.2d 526 (2000). The agreement references "the outline sketch placed upon a copy of the [existing survey] in court today," not the outline sketch to be placed on the existing survey at some future time. To interpret the agreement in the latter manner violates the maxim that "[a] court [simply] cannot . . . disregard the words used by the parties or revise, add to, or create a new agreement." (Internal quotation marks omitted.) *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 374, 321 A.2d 444 (1973).

pertaining to their remaining area." That mutually utilized portion plainly references what is described as "existing driveway" on the existing survey, as no other roadway exists on the parcel.

In addition, the agreement specifically references the "sketch" placed on the existing survey by Joseph Lagosz. The record before us supports the court's finding that he identified the location of the new right-of-way in a clear and definite manner. The existing survey on which he sketched the contours thereof was admitted as an exhibit. Although Joseph Lagosz did not testify at the evidentiary hearing, Bassett provided detailed testimony, which the court credited, describing the right-of-way sketched by Joseph Lagosz. Referencing the existing survey, Bassett retraced that sketch, explaining how the right-of-way proceeded in a westerly direction to a point described on the existing survey as "RBS at 24″ tree w/old barbed wire," then to a second tree to the left of that point also described as "RBS at 24″ tree w/old barbed wire" and, further, "along a line that's marked as . . . 69° 25′ 34″ E" to a point on the plaintiffs' property, which is located in the lower left corner of the existing survey and described as "Dale J. and Maria J. Hogan Vol.549/Pg.849." Per Joseph Lagosz' instructions on May 5, 2008, the new right-of-way was to traverse the southern portion of the parcel, remaining approximately one foot from the property line that borders state owned property.[8] Guilmartin testified that he received similar instructions. As the court found, locating the right-of-way in such manner was to the defendant's benefit, as the new location placed "it farther away from her home than the disputed right-of-way claimed by the plaintiffs in the underlying lawsuit."

---

[8] That property is described on the existing survey as "State of Connecticut area = 3.92 acres."

The agreement further provides for the preparation of a new survey "depicting the newly defined [right-of-way] area," an endeavor in which "[t]he parties will cooperate . . . ." The fact that the new survey memorializing Joseph Lagosz' sketch had yet to be prepared and finalized by the parties does not render the agreement unenforceable, as the defendant suggests. This court has held that "[t]he fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings ripen into an enforceable agreement. The plaintiff cites no authority, and we have found none, that assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together. We know of no authority that precludes contracting parties from engaging in subsequent negotiations to clarify or to modify the agreement that they had earlier reached. . . . Under the modern law of contract, if the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite." *Willow Funding Co., L.P.* v. *Grencom Associates*, 63 Conn. App. 832, 843–44, 779 A.2d 174 (2001). The court properly concluded that the fact that the agreement obligated the parties to work with the surveyor in preparing a survey documenting the new right-of-way does not render the agreement ambiguous or indefinite.

It is well established that "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 87–88, 831 A.2d 211 (2003). The agreement on its face evinces an intent to settle this easement dispute between neighbors by establishing a new right-of-way. See *Isham* v. *Isham*, 292 Conn. 170, 181, 972 A.2d 228

(2009) ("proper inquiry focuses on whether the agreement on its face is reasonably susceptible of more than one interpretation"); 11 S. Williston, Contracts (4th Ed. 1999) § 30:6, pp. 77–80 ("[t]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face"). To that end, the agreement enumerates a number of essential terms concerning, inter alia, the width and location of the new right-of-way, the payment of $5000 by the sellers to the defendant, and the maintenance and use of the right-of-way and the Norton Lane gate. In its memorandum of decision, the court determined that those terms were clear and unambiguous, a determination with which we concur.[9] Accordingly, the court's conclusion that the agreement was summarily enforceable is legally and logically correct and is supported by the factual findings contained in the memorandum of decision.

### III

As a final matter, we address the defendant's claim that the agreement is unenforceable due to the existence of a mutual mistake. "A mutual mistake is one that is common to both parties and effects a result that neither intended. . . . In that sense, a mutual mistake requires a mutual misunderstanding between the parties as to a material fact." (Citation omitted; internal quotation marks omitted.) *BRJM, LLC* v. *Output Systems, Inc.*, 100 Conn. App. 143, 148, 917 A.2d 605, cert. denied, 282 Conn. 917, 925 A.2d 1099 (2007); see also 1 Restatement (Second), Contracts, Mistake § 151, p.

[9] Because we agree with the court that the agreement was clear and unambiguous as to the location of the new right-of-way, the defendant's ancillary contention that the agreement is unenforceable due to the failure to satisfy a condition precedent—namely, agreement as to the location of the new easement granting a right-of-way—is without merit.

385 (1981). The existence of a mutual mistake is a question of fact. *Inland Wetlands & Watercourses Agency* v. *Landmark Investment Group, Inc.*, 218 Conn. 703, 708, 590 A.2d 968 (1991). Although the defendant advanced this claim before the trial court, the record lacks any factual determination on that issue by the court. As such, the record is inadequate for our review, as it is axiomatic that this appellate body does not engage in fact-finding. Connecticut's appellate courts "cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts." *Weil* v. *Miller*, 185 Conn. 495, 502, 441 A.2d 142 (1981).

In the absence of that requisite finding by the trial court, it was incumbent on the defendant to request an articulation of that issue, consistent with her burden to provide this court with an adequate record for review. See Practice Book § 61-10. That she failed to do.[10] Practice Book § 66-5 permits an appellant to seek an articulation by the trial court of the factual and legal basis on which it rendered its decision. "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . An articulation may be necessary where the trial court fails completely to state any basis for its decision . . . or where the basis, although stated, is unclear. . . . The purpose of an articulation is to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Citations omitted; internal quotation marks omitted.) *Fantasia* v. *Milford Fastening Systems*, 86 Conn. App. 270, 283, 860 A.2d 779 (2004), cert. denied, 272 Conn.

---

[10] We note that the defendant on February 24, 2009, filed with the trial court a motion for articulation of its memorandum of decision on a number of issues. That motion did not seek articulation on the defendant's claim of mutual mistake.

919, 866 A.2d 1286 (2005). "[W]e will, in the absence of a motion for articulation, assume that the trial court acted properly." (Internal quotation marks omitted.) *Berglass* v. *Berglass*, 71 Conn. App. 771, 789, 804 A.2d 889 (2002). Consistent with its conclusion that the agreement was summarily enforceable, we thus must presume that the court properly found that a mutual mistake did not exist in the present case.

The judgment is affirmed.

In this opinion the other judges concurred.